**Nicholas J. LaSORELLA, Plaintiff,**

v.

**PENROSE ST. FRANCIS HEALTH-CARE SYSTEM, Defendant.**

**No. 92–K–2119.**

United States District Court,
D. Colorado.

April 26, 1993.

**1414**

Andrew T. Brake, Denver, CO, for plaintiff.

Raymond M. Deany, Glenn M. Schlabs, Sherman & Howard, Colorado Springs, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This case is before me on Penrose St. Francis Healthcare System's ("Penrose") motion to dismiss certain state law claims supplemental to Nicholas LaSorella's ("LaSorella") Age Discrimination in Employment Act claim. Penrose asserts that I lack supplemental jurisdiction under 28 U.S.C. § 1367 or that I should decline jurisdiction because of state claim predomination and the great likelihood of jury confusion. After reviewing the Judicial Improvements Act of 1990 ("JIA"), Pub.L. 101–650, 104 Stat. 5089, I disagree and accordingly accept jurisdiction of the supplemental claims.

## I. Facts and Procedural History

LaSorella worked at Novare Services, Inc. ("Novare") from January 21, 1991 until January 31, 1992 as an electrical maintenance technician at the Penrose facility in Colorado Springs, Colorado. Novare and Penrose are both subsidiaries of the Sisters of Charity Healthcare Systems. The one, a for-profit corporation, performed contract work for the other, a non-profit corporation. In December, 1991, Penrose reorganized and created an in-house electrical maintenance position, thus eliminating the need for LaSorella's services. To protect his employment, LaSorella applied for the new Penrose position on January 21, 1992, and interviewed for it the next day. Penrose did not hire LaSorella for the new position; instead it hired a younger man. After LaSorella exhausted his administrative remedies, he filed this suit on October 27, 1992.

His complaint states two claims for relief, one under the ADEA, the other under state common law for breach of contract and promissory estoppel. He claims Penrose did not hire him because he was fifty-nine years old. He also claims he was entitled to hiring and transferring preference under Penrose's internal employee handbooks and policies.

By minute order of February 22, 1993, I denied Penrose's motion to dismiss, and now write separately to clarify that minute order.

## II. Discussion

### A. Analysis under Gibbs

Before passage of the JIA, I could have summarily disposed of the motion to dismiss. *United Mineworkers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), required me first to determine if I had the constitutional power to exercise what was then called pendent jurisdiction. To do so, I examined the pleadings to determine if there was a common nucleus of operative fact between the federal and state claims. 383 U.S. at 726–27, 86 S.Ct. at 1139. Assuming I had the constitutional power, *Gibbs* then required me to determine whether I should accept jurisdiction of the state claims as a matter of discretion. *Gibbs* taught that I

should dismiss pendant state claims when (1) considerations of judicial economy, convenience and fairness to litigants were not present; (2) a surer-footed reading of state law could be obtained in the state court; (3) state issues predominated in terms of proof, scope of issues raised, or comprehensiveness of remedies sought; or (4) divergent legal theories of relief were likely to cause jury confusion. *Id.*

In applying *Gibbs* and its progeny, most courts typically dismissed the pendant state claims. See, e.g., *Ritter v. Colorado Interstate Gas Co.*, 593 F.Supp. 1279 (D.Colo.1984) (declining jurisdiction because direction of state law was unclear); *Tipton v. Aspen Airways, Inc.*, 741 F.Supp. 1469 (D.Colo.1990) (declining jurisdiction because of state issue predomination and potential for jury confusion); *Hensman v. Adams County Dept. of Soc. Serv.*, 623 F.Supp. 96 (D.Colo.1985) (declining jurisdiction because of uncertain state law, state issue predomination and potential for jury confusion); but see *Kachel v. City of Pueblo*, 732 F.Supp. 1109 (D.Colo.1990) (accepting jurisdiction and finding no risk of jury confusion, or uncertainty of state law). The passage of the JIA, however, throws such a summary disposition into doubt.

### B. The Judicial Improvements Act

The Judicial Improvements Act of 1990 provides as follows:

(a) Except as provided in subsections (b) and (c), ... in any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution....

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

A number of courts have considered the extent to which the JIA differs from the federal common law under *Gibbs*. Most have uncritically suggested that the JIA is merely a codification of the old pendant jurisdiction doctrine, thus allowing them to continue to rely on *Gibbs*. See, e.g., *Walter Fuller Aircraft v. Republic of Philippines*, 965 F.2d 1375, 1389 n. 13 (5th Cir.1992); *Promisel v. First American Artif. Flowers*, 943 F.2d 251, 254 (2d Cir.1991); *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 603 (3d Cir.1991). Some sections of the JIA's legislative history suggest such an interpretation. *See* H.Rep. No. 101–734, 101st Cong.2d Sess., 27–29, 1990 U.S.C.C.A.N. 6802, 6873–75.

■ My reading of the JIA, however, convinces me both that the JIA preserves the basic *Gibbs* constitutional analysis and that it greatly expands the federal courts' supplemental jurisdiction. Nor am I alone in this view. At least two other district courts have reached the same result. *See, York Research Corp. v. Landgarten*, 1992 WL 373268 *3 (S.D.N.Y.1992) ("This analysis is not fundamentally altered by the rules for 'supplemental' jurisdiction, in which Congress effectively codified the judicial doctrines of ancillary and pendent jurisdiction.... The inquiry to be followed under [the JIA] essentially continues the broad constitutional test enunciated in *United Mine Workers v. Gibbs*...."); and *ITT Commercial Finance Corp. v. Unlimited Automotive, Inc.*, 1992 WL 373156 *4 (N.D.Ill.1992).

The primary reasons for the expansion of supplemental jurisdiction is because the JIA specifically preserved only two of the four *Gibbs* discretionary factors. The first *Gibbs* factor, the absence of judicial economy, convenience and fairness to litigants was entirely abandoned, as was the fourth, jury confusion caused by divergent state and federal claims and theories. The second *Gibbs* factor survives intact, the novelty or complexity of the state issue permits the court to decline jurisdiction, as does the third *Gibbs* factor, state issue predomination in terms of proof,

scope of issues raised, or comprehensiveness of remedies sought.

Judge Babcock has recently addressed the JIA's limits on our discretion to decline supplemental jurisdiction, *James v. Sun Glass Hut,* 799 F.Supp. 1083, 1084 (D.Colo.1992) (recognizing the expansionary impact of the JIA, but declining to exercise supplemental jurisdiction because the state claims substantially predominate over the federal claim). Judge Babcock's understanding of the JIA's impact is consistent with most of the commentators. As Wright and Miller put it, "The circumstances in which a court may exercise discretion to refuse to hear a case are quite strictly defined." 13B C. Wright, A. Miller, E. Cooper *Federal Practice and Procedure* § 3567.3 at 39 (2d ed. Supp.1992). Professor Oakley's comments are equally instructive:

> By the juxtaposition of sections 1367(a) and 1367(c) Congress appears to have created a strong presumption in favor of the exercise of supplemental jurisdiction. Section 1367(a) grants the jurisdiction in mandatory terms ... subject to section 1367(c)'s rather strict standards for when the district courts may decline to exercise supplemental jurisdiction.

J. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue: The Judicial Improvement Acts of 1988 and 1990,* 24 U.C.Davis L.Rev. 735, 766 (1991). *And see Cedillo v. Valcar Enterprises,* 773 F.Supp. 932, 940 (N.D.Tex.1991) ("But the statute also cabins that discretion by mandating that supplemental jurisdiction be exercised unless one of the categories in section 1367(c) is met.").

I noted above that some portions of the JIA's legislative history support a different conclusion than I have reached about the limits of supplemental after passage of the JIA. The most specific language is as follows:

> Subsection 114(c) [§ 1367(c)] codifies the factors that the Supreme Court has recognized as providing legitimate bases upon which a district court may decline jurisdiction over a supplemental claim, even though it is empowered to hear the claim.

Subsection (c)(1)–(3) codifies the factors recognized as relevant under current law. H.Rep. No. 101–734, 101st Cong.2d Sess., 29, 1990 U.S.C.C.A.N. 6802, 6875. This passage is simply wrong and I reject it in favor of the plain meaning and language of the JIA.[1]

## C. Analysis Under the JIA

I find first that the nonfederal claims of promissory estoppel/breach of contract are so related to the claim under the Age Discrimination in Employment Act, over which I have original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution. The state claims are related to the federal claim because the evidence involved in the state claim is substantially the same in scope and source as that necessary for the federal claim. Both the state and federal claims arise from common facts. This finding satisfies section 1367(a) and mandates that I exercise supplemental jurisdiction unless one of the exceptions in section 1367(c) applies.

I do not find that the nonfederal claims of promissory estoppel/breach of contract raise "a novel or complex issue of state law." There is a plethora of established state law dealing with the nonfederal claims before me. I am not entering an unsettled field of state law where my decision may be of first impression. Rather, there is a bedrock of precedent to guide my decision. Therefore, I need not refuse jurisdiction based on the concept of judicial comity between the states and the federal courts.

I do not find that the nonfederal claims substantially predominate over the ADEA claim, over which I have original jurisdiction. When I look at the scope of issues raised, the proof involved and the comprehensiveness of the remedies, I do not find that the nonfederal claims will eclipse the ADEA claim.

I have not dismissed the ADEA claim over which I have original jurisdiction, therefore § 1367(c)(3) is inapplicable. Nor do I find this to be an exceptional circumstance where other reasons compel me to decline jurisdiction, as § 1367(c)(4) allows. The instant case

---

1. Professor Oakley suggests that the late night legislative action that accompanied the passage of the JIA may be responsible for some of the oddities of the present statute. 24 U.C.Davis L.Rev. at 736–37 n. 2.

does not involve any exigencies beyond the realm of normal litigation. This case does not implicate any compelling policy arguments against the exercise of supplemental jurisdiction.

The motion to dismiss is accordingly denied.